# UNITED STATES DISTRICT COURT
## District of Kansas
(Kansas City Docket)

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        v.

**DAVID INGRAM,**

        **Defendant.**

CASE NO. 24-CR-20069-DDC-TJJ

**FILED UNDER SEAL**

# INDICTMENT

**THE GRAND JURY CHARGES**:

### COUNTS 1-4

**WIRE FRAUD**
**[18 U.S.C. § 1343]**

Beginning on a date unknown, but no later than in or about January 2019, and continuing until a date unknown, but at least until March 2020, in the District of Kansas and elsewhere, the defendant,

**DAVID INGRAM,**

with intent to defraud, knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property by means of materially false and

1

fraudulent pretenses and representations and by omissions of material facts, well knowing and having reason to know that said pretenses and representations were and would be false and fraudulent when made and caused to be made and that said omissions would be material.

## Parties, Relevant Persons, Entities

At all times relevant to this Indictment:

1. DAVID INGRAM was a resident of North Carolina.

2. AltosGroups was a company controlled by INGRAM. INGRAM was, or held himself out to be, the founder and managing partner of AltosGroups.

3. Maumee Point, LLC ("Maumee Point") was the developer of an assisted living or memory care senior facility to be located in Maumee, Ohio (the "Assisted Living Facility Project").

4. One10 Hotel HRKC LLC ("HRKC") was the developer of a Hard Rock Hotel to be located in Edwardsville, Kansas (the "Hard Rock Project").

5. 900 Broadway KC Development Company LLC ("900 Broadway") was the developer of a Hyatt House hotel to be located in downtown Kansas City, Missouri (the "Hyatt House Project").

6. A&B Kanab Hotels LLC ("A&B Kanab") was the developer of a Springhill Suites to be located in Kanab, Utah (the "Springhill Suites Project").

## Manner and Means

7. The object of the scheme to defraud was for INGRAM to induce real estate developers around the country to enter into loan agreements by making fraudulent

representations concerning AltosGroups' ability to provide financing. After obtaining initial deposits from the victims, INGRAM misappropriated or diverted the deposits to other AltosGroups accounts.

8. As part of the scheme to defraud, INGRAM misrepresented or exaggerated his and AltosGroups' experience as a lender for large-scale construction projects.

9. INGRAM represented to victims that AltosGroups had "warehouse" lines of credit with major international financial institutions, such as JPMorgan Chase and Bank of America. As a condition of AltosGroups providing financing, INGRAM required that the victims wire deposits to AltosGroups bank accounts, which he represented would trigger AltosGroups' line of credit with one of these financial institutions. INGRAM and AltosGroups represented that the deposits would be placed in dedicated escrow or reserve accounts.

10. In reality, however, neither INGRAM nor AltosGroups had a line of credit with JPMorgan Chase or Bank of America and the victims' deposits were not kept in dedicated accounts. Rather, the majority of the deposits were commingled with other funds, used for other business purposes, disbursed to fund portions of loans made to other victims, transferred to other accounts controlled by INGRAM or his wife, or used for INGRAM and his wife's personal expenses, and ultimately depleted.

11. AltosGroups failed to finance the victims' construction projects and did not return the majority of their deposits.

## The Maumee Point Ohio Victims

12. Beginning in or about January 2019, Maumee Point representatives were introduced to AltosGroups as a potential lender for the Assisted Living Facility Project and submitted a loan request.

13. In discussions with Maumee Point, INGRAM misrepresented or exaggerated his and AltosGroups' experience as a lender for major construction projects.

14. INGRAM fraudulently represented that AltosGroups had a line of credit with JPMorgan Chase that was sufficient to fund the Assisted Living Facility Project.

15. Based on those representations, among others, Maumee Point entered into a series of agreements whereby AltosGroups would provide financing for the Assisted Living Facility Project. On or about November 21, 2019, Maumee Point and AltosGroups entered into a loan agreement in which AltosGroups agreed to provide financing in the amount of approximately $11,668,785.

16. On November 25, 2019, Maumee Point wired a deposit of $327,641.77 to AltosGroups JPMC account ending in 7392. On January 28, 2020, $98,167.69 of the deposit was remitted back to Maumee Point as the "First Draw."

17. However, in a March 6, 2020 letter, INGRAM informed Maumee Point that AltosGroups would not be able to provide financing for the Assisted Living Facility Project.

18. INGRAM did not return the balance of the down payment deposit to Maumee Point.

4

**The Hard Rock Kansas Victims**

19. In or about March 2019, HRKC was introduced to INGRAM and AltosGroups.

20. In discussions with HRKC, INGRAM misrepresented or exaggerated his and AltosGroups' experience as a lender for major construction projects.

21. For example, during an initial telephone call with HRKC, INGRAM represented that he had previously worked on Hard Rock-branded projects and had a relationship with the company. In that same call, INGRAM said that AltosGroups had lines of credit with JP Morgan Chase and Bank of America that were sufficient to fund the Hard Rock Project.

22. INGRAM continued to make fraudulent representations about lines of credit with JP Morgan Chase and Bank of America, personally and through representatives of AltosGroups, in discussions throughout 2019 and in loan documents.

23. In July 2019, for example, HRKC executed a loan commitment with AltosGroups. The commitment indicated that a fee would be paid to the "bank providing the line of credit for project funding," consistent with INGRAM's representations about AltosGroups' purported lines of credit with JP Morgan Chase and Bank of America.

24. In September 2019, in response to questions from the public finance firm retained by HRKC, INGRAM said that he could not provide verification that the line of credit lender had funds available to make the loan until "the project lodges [its] down payment."

25. Ultimately, HRKC borrowed the funds to make the downpayment that INGRAM represented would trigger the line of credit to fund the Hard Rock Project.

26. The loan closed on October 30, 2019. The agreement required AltosGroups to loan HRKC approximately $48,823,603 for the Hard Rock Project. At the time of closing, HRKC wired funds to Chicago Title Insurance Company to be held in escrow.

27. On or about November 6, 2019, INGRAM executed a "Down Payment Deposit Agreement" with HRKC. The agreement provided that HRKC would deposit a down payment of approximately $3,000,674 into a "reserve account" that would be used "for sole purpose of holding [HRKC] Down Payment Deposits as required in loan approval, under the terms and conditions of this Agreement." The agreement, signed by INGRAM, required that HRKC make the deposit into an AltosGroups JPMorgan Chase ("JPMC") account ending in 2995. The agreement provided that "at no times may said account be moved, transferred, pledged, assigned, or closed, with the sole exceptions of the Deposit Amount being paid into the project monthly draw schedule as described herein, or a return of deposit to [HRKC] as required herein." INGRAM further represented in the agreement that AltosGroups would "release any funds held under this Agreement from Reserve Account strictly in accordance with this Agreement."

28. On or about November 13, 2019, Chicago Title Insurance Company, after receiving approval from AltosGroups, wired a down payment of approximately $3,000,674 to the deposit reserve account, AltosGroups JPMC Account 2995. INGRAM knew that AltosGroups JPMC Account 2995 was not, in fact, a reserve account. Prior to

6

receiving the down payment, AltosGroups JPMC Account 2995 had a balance of approximately $710.67.

29.     Less than two weeks later, on November 26, 2019, approximately $3,000,000 was transferred from the deposit reserve account (AltosGroups JPMC Account 2995) to AltosGroups JPMC Account 7392.  The same day, $3,000,000 was transferred from AltosGroups JPMC Account 7392 to a Banco Ve Por Mas account, a Mexico-based financial institution.  After the transfer to Banco Ve Por Mas, AltosGroups JPMC Account 2995 balance was less than $1,400.  None of these disbursements were authorized by HRKC.

30.     In January 2020, AltosGroups failed to disburse the initial loan proceeds it was obligated to provide.

31.     In a March 6, 2020 letter, INGRAM informed HRKC that AltosGroups would not be able to provide financing for the Hard Rock Project.  Notwithstanding that INGRAM had months earlier transferred or caused the transfer of $3 million from AltosGroups JMPC Account 2995 to another AltosGroups account, and then to Banco Ve Por Mas, INGRAM indicated that money on deposit with AltosGroups was "available for return."

32.     HRKC requested that the $3,000,674 down payment deposit be returned, believing it was still in the reserve account (AltosGroups JPMC Account 2995), as INGRAM had represented it would be.  INGRAM, however, never returned the down payment deposit.

**The Hyatt House Kansas City Victims**

33.     In or about April 2019, 900 Broadway was introduced to INGRAM and AltosGroups.  During the course of initial discussions, INGRAM, or individuals acting on his behalf,  misrepresented or exaggerated INGRAM and AltosGroups' experience as a lender for major construction projects.  INGRAM also fraudulently represented that AltosGroups had lines of credit with JP Morgan Chase and Bank of America.

34.     In October 2019, AltosGroups and 900 Broadway entered into a series of agreements, pursuant to which AltosGroups would loan $24,148,387 for the Hyatt House Project.

35.     On or about October 1, 2019, INGRAM executed a "Down Payment Deposit Agreement" with 900 Broadway.  The agreement provided that 900 Broadway would deposit a down payment of $972,027 into a "reserve account created and maintained for the purposes" of the Hyatt House Project.  The "reserve account" was to be used "for sole purpose of holding [900 Broadway] Down Payment Deposits as required in loan approval, under the terms and conditions of this Agreement."  The agreement, signed by INGRAM, required that 900 Broadway make the deposit into an AltosGroups account at Bank of America ending in 1655 ("AltosGroups BofA Account 1655").  The agreement provided that "at no times may said account be moved, transferred, pledged, assigned, or closed, with the sole exceptions of the Deposit Amount being paid into the project monthly draw schedule as described herein, or a return of deposit to [900 Broadway] as required herein."  INGRAM further represented in the

agreement that AltosGroups would "release any funds held under this Agreement from Reserve Account strictly in accordance with this Agreement."

36. On October 3, 2019, 900 Broadway sent down payment deposits totaling $972,027 to the reserve account, AltosGroups BofA Account 1655. INGRAM knew that AltosGroups BofA Account 1655 was not, in fact, a reserve account. Contrary to the Down Payment Deposit Agreement, this deposit was commingled with other funds. By the end of October 2019, the majority of the funds in AltosGroups BofA Account 1655 had been wired to other financial institutions or transferred to other AltosGroups accounts at Bank of America. None of these disbursements were authorized by 900 Broadway.

37. In January 2020, pursuant to the loan agreement, 900 Broadway submitted a request to AltosGroups for reimbursement of $530,127.07 in construction costs. AltosGroups paid this request, using funds that came predominantly from a down payment deposit made by A&B Kanab in connection with the Springhill Suites Project.

38. In a March 6, 2020 letter, INGRAM informed 900 Broadway that Altogroups would not be able to provide financing. Notwithstanding that INGRAM had transferred or caused the transfer of the majority of the funds from AltosGroups BofA Account 1655, INGRAM indicated that money on deposit with AltosGroups was "available for return." INGRAM, however, never returned the balance of the down payment deposit, which was $441,899.93.

**The Springhill Suites Utah Victims**

39. In 2019, A&B Kanab was introduced to INGRAM and AltosGroups.

40. On or about December 27, 2019, INGRAM executed a "Down Payment Deposit Agreement" with A&B Kanab. The agreement provided that A&B Kanab would deposit a down payment of $1,523,971 into a "reserve account" that was "created and maintained for the purposes" of the Springhill Suites Project. The "reserve account" was to be used "for sole purpose of holding [A&B Kanab] Down Payment Deposits as required in loan approval, under the terms and conditions of this Agreement." The agreement, signed by INGRAM, required that A&B Kanab make the deposit into AltosGroups JPMC Account 7392. The agreement provided that "at no times may said account be moved, transferred, pledged, assigned, or closed, with the sole exceptions of the Deposit Amount being paid into the project monthly draw schedule as described herein, or a return of deposit to [A&B Kanab] as required herein." INGRAM further represented in the agreement that AltosGroups would "release any funds held under this Agreement from Reserve Account strictly in accordance with this Agreement."

41. On or about December 31, 2019, A&B Kanab transferred $1,523,971 to AltosGroups JPMC Account 7392. INGRAM knew that AltosGroups JPMC Account 7392 was not, in fact, a reserve account. Prior to A&B Kanab's deposit, AltosGroups JPMC Account 7392 had a balance of approximately $96,000.

42. On or about January 10, 2020, INGRAM and AltosGroups and A&B Kanab entered into a loan agreement, pursuant to which AltosGroups would loan approximately $9,000,000 for the Springhill Suites Project. According to the approved

draw schedule incorporated into the agreement, the first two payments made by AltosGroups would include the $1,523,971 down payment that A&B Kanab made into AltosGroups JPMC Account 7392.

43. Between January and March 2020, A&B Kanab's down payment deposit was commingled with other funds in AltosGroups JPMC Account 7392. The account was drawn down to less than $100,000 by the end of February 2020, including the payment of $530,127.07 to 900 Broadway and more than $100,000 in AltosGroups "salary" payments that were transferred to AltosGroups BofA Account 1655. None of these disbursements were authorized by A&B Kanab.

44. In a March 6, 2020 letter, INGRAM informed A&B Kanab that Altogroups would not be able to provide financing for the Springhill Suites Project. Notwithstanding that INGRAM had transferred or caused the transfer of the vast majority of A&B Kanab's deposit from AltosGroups JPMC Account 7392, INGRAM indicated that funds on deposit with AltosGroups would be returned. INGRAM, however, did not return the down payment deposit.

## Execution of the Scheme

45. On or about the dates set forth in separate counts below, in the District of Kansas and elsewhere, the defendant,

**DAVID INGRAM,**

for the purpose of executing and attempting to execute the aforementioned scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses and representations, and by omission of material facts, did, with intent to

defraud, transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds; that is, wire communications related to the Hard Rock Hotel Project and the transfer of money from HRKC to AltosGroups:

| COUNT | DATE | WIRE DESCRIPTION |
|---|---|---|
| 1 | 10/29/2019 | Email from C.D. to Chicago Title in Overland Park, Kansas providing wire instructions for the net payoff for Hard Rock Project land at closing |
| 2 | 10/30/2019 | Email from D.W., on behalf of AltosGroups, to Chicago Title in Overland Park, Kansas authorizing the Hard Rock Project financing closing and release of funds |
| 3 | 11/12/2019 | Email from J.N., on behalf of AltosGroups, to Chicago Title in Overland Park, Kansas providing amounts, location, and wire instructions for the release of funds from Chicago Title to AltosGroups |
| 4 | 11/13/2019 | Email from Chicago Title in Overland Park, Kansas to Chicago Title in Chicago, Illinois attaching a form requesting the transfer of $3,000,674 in HRKC funds to AltosGroups JPMC Account 2995 |

In violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE NOTICE

46.     The allegations contained in paragraphs 1-45 and Counts 1-4 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(1).

47.     Upon conviction of the offense set forth in Counts 1-4 of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United

States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

    A. A forfeiture money judgment against the defendant in an amount equal to the amount of gross proceeds obtained or derived by him from the scheme to defraud as set out in Counts 1-4.

48. If any of the property described above, as a result of any act or omission of the defendant:

    A. cannot be located upon the exercise of due diligence;

    B. has been transferred or sold to, or deposited with, a third party;

    C. has been placed beyond the jurisdiction of the court;

    D. has been substantially diminished in value; or

    E. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

July 26, 2024       s/Foreperson
DATE       FOREPERSON OF THE GRAND JURY

KATE E. BRUBACHER
UNITED STATES ATTORNEY

By: /s/ *Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Ryan.Huschka@usdoj.gov
Ks. S. Ct. No. 23840

> IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

## **PENALTIES**

### Counts 1-4:  Wire Fraud

- Punishable by a term of imprisonment of not more than twenty (20) years.  18 U.S.C. § 1341.

- A term of supervised release of not more than three (3) years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).  In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.  18 U.S.C. § 3571(d).

- A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.